**R.T. VANDERBILT COMPANY, Petitioner,**

**v.**

**OCCUPATIONAL SAFETY AND HEALTH REVIEW COMMISSION and Raymond J. Donovan, Respondents.**

**No. 82-5604.**

United States Court of Appeals, Eleventh Circuit.

June 16, 1983.

Guy F. Driver, Jr., Winston-Salem, N.C., for petitioner.

Edward G. Hoban, Washington, D.C., for Occupational Safety & Health Review Com'n.

Ann D. Nachbar, Solicitor's Office, U.S. Dept. of Labor, Washington, D.C., for Donovan.

Before JOHNSON and ANDERSON, Circuit Judges, and COLEMAN *, Senior Circuit Judge.

JOHNSON, Circuit Judge:

I.

Asbestos is a generic term that describes a variety of naturally occurring fibrous, incombustible silicate minerals. Although tremendously valuable to industry, these minerals have been closely linked to lung cancer and asbestosis, a degenerative lung-scarring disease. *See generally* Notice of Proposed Rulemaking, "Occupational Exposure to Asbestos," 40 Fed.Reg. 47652 at 47653–56 (Oct. 9, 1975). The Occupational Safety and Health Administration (OSHA) therefore has regulated employee exposure to asbestos since shortly after the agency's inception. OSHA has defined asbestos, established standards for its use, and set permissible exposure limits.[1] 29 C.F.R. § 1910.1001.

The R.T. Vanderbilt Company mines and distributes an industrial talc, NYTAL 99. The Wenczel Tile Company uses NYTAL 99 in manufacturing tile at its workplace in Tampa, Florida. In February 1976, OSHA representatives inspected Wenczel's plant and issued a citation for violation of its asbestos standards. The parties entered into a settlement agreement, approved by the Occupational Safety and Health Review Commission (the Commission), whereby all allegations of violations of the asbestos standard were withdrawn. The parties substituted a stipulation that Wenczel had failed to reduce ceiling levels of fibrous talc to permissible levels. Under the terms of the agreement Wenczel was given until September 20, 1977, to achieve compliance with the talc standard. While the agreement was still in effect, OSHA changed its enforcement policy regarding tremolytic talc.[2] In April 1977, in response to an em-

* Honorable James P. Coleman, U.S. Circuit Judge for the Fifth Circuit, sitting by designation.

1. On May 29, 1971, pursuant to 29 U.S.C.A. § 655(a), the Secretary of Labor published a table setting threshold limit values for a number of airborne contaminants, including tremolite, asbestos and talc. 29 C.F.R. § 1910.93, Table G-3; 36 Fed.Reg. 10503–06. On December 7, 1971, pursuant to 29 U.S.C.A. § 655(c), OSHA issued a temporary emergency standard revising Table G-3. 36 Fed.Reg. 23267. The emergency standard deleted the table's reference to asbestos and tremolite, adding a new section entitled "asbestos dust." The Secretary then published a notice of proposed rulemaking along with a proposed permanent asbestos standard which paralleled the emergency standard. Interested parties were invited to comment or object. 37 Fed.Reg. 466. A five-member Advisory Committee was formed to assist in developing the final standard and the National Institute for Occupational Safety and Health (NIOSH) also submitted recommendations. A public hearing was conducted from March 14–17, 1972, at which various representatives and experts appeared on behalf of interested parties, and on June 7, 1972, the Secretary published a final Standard for Exposure to Asbestos Dust. 37 Fed.Reg. 11318–22. The standard included a new subsection which defined "asbestos" and "asbestos fibers." As defined, "'Asbestos' includes chrysotile, amosite, crocidolite, tremolite, anthophyllite, and actinolite." 29 C.F.R. § 1910.1001(a)(1). "'Asbestos fibers' means asbestos fibers longer than 5 micrometers." 29 C.F.R. § 1910.-1001(a)(2).

2. In testing samples for asbestos fiber content, OSHA analysts count only fibers which are at least three times longer than wide. Between November 1974 and January 1977, however, as a matter of policy in analyzing talcs, which were thought to be less dangerous than asbestos, OSHA counted only fibers which were five times longer than wide. On November 21,

ployee's complaint about excessively dusty working conditions, OSHA inspected Wenczel's Tampa workplace. The inspector took air and bulk samples to determine whether workers were exposed to asbestos. Laboratory analysis of the samples indicated the presence of anthophyllite and tremolite fibers, which are defined by OSHA as asbestos. *See* 29 C.F.R. § 1910.1001(a)(1). As a result of the inspection OSHA cited Wenczel on June 10, 1977, for its failure to comply with the asbestos standard as required by 29 U.S.C.A. § 654(a)(2). Specifically, Wenczel was alleged to have: failed to conduct initial monitoring of employee exposure to asbestos, in violation of 29 C.F.R. § 1910.1001(f)(1); failed to affix asbestos caution labels on the bags of NYTAL 99, on the pallets on which the bags were stored, and on the portable waste-bins in which the NYTAL 99 sweepings were disposed, in violation of 29 C.F.R. § 1910.1001(g)(2)(i); and failed to provide medical examinations for employees exposed to asbestos, in violation of 29 C.F.R. § 1910.1001(j).

Wenczel contested the citation pursuant to 29 U.S.C.A. § 659(a), thereby invoking the Commission's jurisdiction. The case was assigned to an administrative law judge (ALJ), and Vanderbilt intervened on behalf of Wenczel, its customer. Wenczel and Vanderbilt disputed the accuracy and reliability of the laboratory techniques used by OSHA but presented no contrary laboratory findings. The companies also argued that OSHA's 3-to-1 length/width ratio, *see* note 2 *supra,* is mineralogically unsound for defining a "fiber", that the asbestos standard had been improperly promulgated and is therefore invalid, and that 29 C.F.R. § 1910.1001(a)(1) is unconstitutionally vague. They further argued that OSHA had not made out a *prima facie* case, that OSHA was estopped because of its 1976 settlement with Wenczel, and that Wenczel could not have known through the exercise of reasonable diligence that NYTAL contained asbestos so it should not be held responsible for failing to comply with the asbestos standard.

After a three-day administrative hearing the ALJ rejected the companies' attack on OSHA's laboratory techniques and found that the samples contained asbestos within the meaning of the OSHA standard. The ALJ refused to consider a challenge to the asbestos standard, noting that the Commission's function "does not include reviewing the wisdom of a standard wherein certain minerals are regulated as asbestos." Nevertheless, he vacated the citations. The 1976 settlement stipulated that Wenczel had failed to comply with ceiling limits established for fibrous talc, but it did not state that there had been a violation of the asbestos standard. The ALJ found that because of the settlement Wenczel lacked actual or constructive knowledge of the presence of asbestos in its workplace. Wenczel was in compliance with the standard it had been led to believe was controlling.

On discretionary review, the Commission upheld the ALJ's vacation of the citations, concluding that he had properly evaluated the evidence concerning both the asbestos content of the talc and Wenczel's lack of knowledge that asbestos was present in its workplace. Petitioner Vanderbilt now appeals to this Court pursuant to 29 U.S.C.A. § 660(a).[3] Wenczel and the Secretary of

1974, OSHA issued Field Information Memorandum (FIM) # 74–92 which stated that for a fiber found in talc to be considered "asbestiform or fibrous," it must be five times or more longer than wide. The FIM stated that this policy was temporary and might change as a result of an ongoing study by NIOSH. On January 19, 1977, after preliminary findings of NIOSH showed that workers exposed to tremolytic talc died from lung cancer and other respiratory diseases at significantly higher rates than normal populations, the Assistant Secretary cancelled FIM # 74–92. He expressly noted "that a tremolite fiber is an asbestos fiber under OSHA's asbestos standard." Notification of OSHA's reversion to the 3 to 1 length/width ratio was sent to Vanderbilt.

3. 29 U.S.C.A. § 660(a) provides, in pertinent part:

> Any person adversely affected or aggrieved by an order of the Commission issued under subsection (c) of section 659 of this title may obtain review of such order in any United States court of appeals for the circuit in which the violation is alleged to have oc-

Labor do not appeal. Vanderbilt does not seek reversal of the decision below, but rather challenges the Commission's finding that the talc samples contained asbestos, and argues that we should find the asbestos standard unenforceable because of vagueness and procedural irregularities. We will not address these issues, however, because we find that Vanderbilt lacks standing to prosecute this appeal.

II.

The "standing" question in this case, as in most public disputes, is two-fold. First, we must find that petitioner's claim is cognizable under Article III. Second, we must find that petitioner has a right of action under the Occupational Safety and Health Act. *James v. Home Construction Company of Mobile,* 689 F.2d 1357, 1358 (11th Cir.1982); *see Warth v. Seldin,* 422 U.S. 490, 500–01, 95 S.Ct. 2197, 2205–06, 45 L.Ed.2d 343 (1975).

The "judicial power" of the federal courts is limited by Article III to adjudication of "the legal rights of litigants in actual controversies." *Liverpool S.S. Co. v. Commissioners of Emigration,* 113 U.S. 33, 39, 5 S.Ct. 352, 355, 28 L.Ed. 899 (1885); *Marbury v. Madison,* 1 Cranch 137, 170, 2 L.Ed. 60 (1803). Under this model of judicial review the federal courts are constitutionally empowered only to render judgments which are not advisory opinions, *Muskrat v. United States,* 219 U.S. 346, 361–62, 31 S.Ct. 250, 255–56, 55 L.Ed. 246 (1911); *Correspondence of the Justices* (1793) (found in 3 *Johnston, Correspondence and Public Papers of John Jay* 486–89 (1891)), or political in nature, *Marbury, supra,* 1 Cranch at 170, 2 L.Ed. 60, or subject to revision by a coordinate branch, *Hayburn's Case,* 2 Dallas 408, 409, 410, 1 L.Ed. 436 (1792). The Supreme Court recently stated that:

> [A]t an irreducible minimum, Art. III requires the party who invokes the court's authority to "show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant," *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99 [99 S.Ct. 1601, 1607, 60 L.Ed.2d 66] (1979), and that the injury "fairly can be traced to the challenged action" and "is likely to be redressed by a favorable decision," *Simon v. Eastern Kentucky Welfare Rights Org.,* 426 U.S. 26, 38, 41 [96 S.Ct. 1917, 1924–1925, 48 L.Ed.2d 450] (1976).

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982). The Court explained that this requirement of "actual injury redressable by the court" tends to assure that legal questions will be resolved in and limited by a concrete factual context, "reflects a due regard for the autonomy of those persons most directly affected by a judicial order," and accords respect to the separation of powers by avoiding anticipation of constitutional questions in advance of the necessity of deciding them. *Id.* at 472–74, 102 S.Ct. at 758–759.

The existence of a "case or controversy" is necessary but not sufficient to invoke a court's determination of the merits. We must also find that a litigant possesses a right of action; this turns on whether he is an appropriate party to assert the violation of a primary legal right[4] which, if proven, warrants giving him a suitable remedy.[5]

curred or where the employer has its principal office....

4. *See generally* H.M. Hart & A. Sachs, *The Legal Process: Basic Problems in the Making and Application of Law* 135, 145–46, 150 (unpublished ed. 1958). A primary legal right is a valid claim to the personal benefit of the performance of a primary legal duty. *See id.* at 153.

5. Hart & Sachs, *supra,* at 154; *see also* Hart & Wechsler's *The Federal Courts and the Federal System* 156 (2d ed. 1973). Ordinarily, the breach of a primary legal duty will give rise, by operation of law, to one or more remedial rights of action, but the violation of a primary legal right does not necessarily create a right of action in the injured party. For example, in certain regulatory statutes designed to protect the public, the remedial provisions must be carefully balanced to avoid overenforcement.

For many years the Supreme Court did not separate the constitutional (case or controversy) aspect of standing from its non-constitutional (right of action) aspect. The Court's single inquiry turned on whether litigants could allege injury to their own "legal rights."[6] *See Tyler v. Judges of Court of Registration,* 179 U.S. 405, 408–10, 21 S.Ct. 206, 207–208, 45 L.Ed. 252 (1900). Largely because of the growth of administrative agencies and Congress' desire to make agencies more accountable, *see L. Jaffe, Judicial Control of Administrative Action* 320 (1965), however, the Court has increasingly recognized the standing of litigants who lack injury to a personal legal right. The turning point was *FCC v. Sanders Brothers Radio Station,* 309 U.S. 470, 60 S.Ct. 693, 84 L.Ed. 869 (1940), in which a licensee whose only asserted injury was economic disadvantage sustained through lawful competition was permitted to challenge the FCC's grant of a radio license to a competitor. The Court granted Sanders Brothers standing because it concluded that Congress had the power to confer, and in Section 402(b)(6) of the Federal Communications Act, 47 U.S.C.A. §§ 151–609, had in fact conferred, a right of action to represent the public interest upon competitors such as Sanders Brothers which had suffered only economic injury. *See* 309 U.S. at 477, 60 S.Ct. at 698. It is now established law that, when an injured party cannot assert the violation of a personal legal right, a court will still grant standing if a right of action has been expressly or impliedly provided by Congress[7] or the Constitution.[8] *See Warth v. Seldin, supra,* 422 U.S. at 500–01, 95 S.Ct. at 2205–06.

So although members of the public may have a primary legal right as the beneficiaries of a statutorily imposed duty, to allow private rights of action could be inconsistent with the primary purposes of the statute. Authority to sue under the statute might only be vested in a government official or agency, as in § 45 of the Federal Trade Commission Act, 15 U.S.C.A. §§ 41 *et seq.,* which prohibits unfair methods of competition. Under that Act, consumers and members of the public—the beneficiaries of the statute—are not provided a private right of action. *Holloway v. Bristol-Myers Corp.,* 485 F.2d 986 (D.C.Cir.1973).

6. *Alabama Power Co. v. Ickes,* 302 U.S. 464, 479, 58 S.Ct. 300, 303, 82 L.Ed. 374 (1938). Whether a litigant had a "legal right" in the sense that the term was then used depended on the availability of a legal remedy. This meaning differs from that of a primary legal right. *See* notes 4 and 5 *supra.* Primary rights do not depend on the availability of remedies but, rather, remedies are designed by legislatures and the courts to foster the primary purposes of laws. *See* Hart & Sachs, *supra,* at 152.

7. *E.g., Cannon v. University of Chicago,* 441 U.S. 677, 99 S.Ct. 1946, 60 L.Ed.2d 560 (1979) (implied right of action under Title IX of the Education Amendments of 1972, 20 U.S.C.A. §§ 1681–83). In determining "whether Congress intended to create a private right of action under a federal statute without saying so explicitly[,] [t]he key to the inquiry is the intent of the legislature." *Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n,* 453 U.S. 1, 12, 101 S.Ct. 2615, 2622, 69 L.Ed.2d 435 (1981).

8. The test for implying rights of action under the Constitution is less stringent than that under statutes. In *Davis v. Passman,* 442 U.S. 228, 99 S.Ct. 2264, 60 L.Ed.2d 846 (1979), the Supreme Court stated that, "in the absence of 'a textually demonstrable constitutional commitment of [an] issue to a coordinate political department,' *Baker v. Carr, supra,* 369 U.S. [186] at 217 [82 S.Ct. 691 at 710, 7 L.Ed.2d 663], we presume that justiciable constitutional rights are to be enforced through the courts." 442 U.S. at 242, 99 S.Ct. at 2275. *Flast v. Cohen,* 392 U.S. 83, 88 S.Ct. 1942, 20 L.Ed.2d 947 (1968), presents an example of an implied right of action under the Constitution. The *Flast* Court established a two-part test for determining whether a federal taxpayer is a "*proper* and *appropriate* party to invoke federal judicial power" to challenge federal programs. *Id.* at 102, 88 S.Ct. at 1953 (emphasis added). First, "a taxpayer will be a *proper* party to allege the unconstitutionality only of exercises of congressional power under the taxing and spending clause of Art. I, § 8 of the Constitution." *Id.* (emphasis added). The Court's use of "proper", suggesting a constitutional limitation, rather than "appropriate", suggesting a prudential concern, and its citation of *Doremus v. Board of Educ.,* 342 U.S. 429, 72 S.Ct. 394, 96 L.Ed. 475 (1952), as a counterexample, indicate that this test determines the existence of injury sufficient to make out a case or controversy. Second, "the taxpayer must show that the challenged enactment exceeds specific constitutional limitations imposed upon the exercise of the congressional taxing and spending power and not simply that the enactment is generally beyond the powers delegated to Congress by Art. I, § 8." 392 U.S.

A court's determination of whether a right of action is presented involves a prudential rule of self-restraint. Because it is not constitutionally imposed, Congress may "resolve the question one way or another." *See Association of Data Processing Service Organizations, Inc. v. Camp,* 397 U.S. 150, 154, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970). It follows that in deciding whether a statute provides a right of action a court must determine the intent of the legislature; it must decide whether recognition of a right of action in the plaintiff will foster the primary purposes of the law as indicated by the legislature. *See id.* at 156–57, 90 S.Ct. at 831–32. In *Data Processing,* the Supreme Court formulated the test for standing under the Administrative Procedure Act, 5 U.S.C.A. §§ 551 *et seq.* (APA). The Court held that, if Congress has not precluded review of the administrative action which is being challenged, and injury in fact is shown, then standing will be granted so long as the "interest sought to be protected by the complainant is arguably within the zone of interests to be protected or regulated by the statute ... in question." 397 U.S. at 153, 90 S.Ct. at 830. In Section 702 of the APA, Congress expressly provided a right of action for persons "adversely affected or aggrieved by agency action within the meaning of a relevant statute." 5 U.S.C.A. § 702. The *Data Processing* Court recognized that Congress has tended to enlarge the class of people who may protest administrative action, 397 U.S. at 154, 90 S.Ct. at 830, and it concluded that the general policy of the relevant statutes would be furthered by granting standing to "those whose interests are directly affected." *Id.* at 157, 90 S.Ct. at 832. The Court therefore found that Congress, by using the words "adversely affected or aggrieved" intended to provide a right of action under the APA to all those who assert an interest that is arguably within the "zone of interests" of a relevant statute. In determining whether the interest asserted by a party is one intended by Congress to be protected or regulated by the statute under which the suit is brought, courts have generally examined the language of the relevant statutory provisions, the pertinent regulations, and the legislative history. *E.g., Fire Equipment Manufacturers' Association, Inc. v. Marshall,* 679 F.2d 679, 681 (7th Cir.1982), *cert. denied,* — U.S. —, 103 S.Ct. 728, 74 L.Ed.2d 953 (1983); *Control Data Corp. v. Baldrige,* 655 F.2d 283, 293–94 (D.C.Cir. 1981).

III.

The Occupational Safety and Health Commission vacated Wenczel's citation because it found that Wenczel lacked actual or constructive knowledge of the presence of asbestos in its workplace. Additionally, the Commission found that asbestos fibers were present in the NYTAL 99 used by Wenczel. This latter finding, which purports to be an adjudication of one of the issues litigated, was neither necessary to nor supportive of the result. Although it cannot, therefore, have any collateral estoppel effect on Wenczel or Vanderbilt, *see* 1B J. Moore, *Federal Practice* ¶ 0.443[5] (2d ed. 1982), it may have practical consequences injurious to Vanderbilt. By impugning the integrity of NYTAL 99, the Commission's finding has caused Vanderbilt actual injury redressable by this Court. Vanderbilt therefore satisfies Article III's requirement of a personal stake in the outcome of this appeal insofar as it requests that we vacate the Commission's finding that the talc samples contained asbestos. *Deposit Guaranty National Bank v. Roper,* 445 U.S. 326, 334–35, 100 S.Ct. 1166, 1171–72, 63 L.Ed.2d 427 (1980); *Electrical Fittings Corp. v. Thomas & Betts Co.,* 307 U.S. 241, 242, 59 S.Ct. 860, 860–61, 83 L.Ed. 1263 (1939). But the fact that this Court has constitutional authority to eliminate the Commission's gratuitous finding does not mean that we have the power to pass on the merits of that finding. *Id.* Appellate re-

at 102–03, 88 S.Ct. at 1953–54. Because the Establishment Clause is a specific constitutional limitation on the taxing and spending power, the Court apparently found that it confers a right of action on taxpayer-plaintiffs to challenge the constitutionality of expenditures that arguably establish religion. *Id.* at 103–04, 88 S.Ct. at 1954–55.

view of findings immaterial to the disposition of a case amounts to nothing more than an advisory opinion. *See Aetna Life Ins. Co. v. Haworth,* 300 U.S. 227, 240–41, 57 S.Ct. 461, 463–64, 81 L.Ed. 617 (1937). Decision of such a hypothetical controversy cannot legally bind the parties, *see Muskrat, supra,* 219 U.S. at 362, 31 S.Ct. at 255–56, and is not authorized by Article III. *Preiser v. Newkirk,* 422 U.S. 395, 401, 95 S.Ct. 2330, 2334, 45 L.Ed.2d 272 (1975). We therefore hold that this case is cognizable under Article III only to the extent that Vanderbilt asks this Court to vacate the Commission's asbestos finding.[9]

There can be no doubt that Wenczel, an employer regulated by the Occupational Safety and Health Act, has a right of action under the Act and could bring this appeal. Vanderbilt, on the other hand, is not "arguably within the zone of interests to be protected or regulated by the statute," *see Data Processing, supra,* 397 U.S. at 153, 90 S.Ct. at 830, and therefore lacks a right of action.[10]

Vanderbilt argues that it has been adversely affected by the Commission's order, but it makes no assertion that it is arguably protected or regulated by the Occupational Safety and Health Act. The purpose of the Act, as stated in 29 U.S.C.A. § 651(b), is "to assure so far as possible every working man and woman in the Nation safe and healthful working conditions and to preserve our human resources." *See also* S.Rep. No. 1282, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 5177. Congress clearly intended to protect the interests of employees in securing safe working conditions. *Fire Equipment Manufacturers, supra,* 679 F.2d at 682. In order to effectuate the purposes of the Act the Secretary of Labor is authorized to set mandatory occupational safety and health standards and to compel employer compliance with the standards. *See* 29 U.S.C.A. §§ 651(b)(3), 655, 657–59. Employers are thereby regulated by the Act and by regulations promulgated thereunder. But mineral suppliers such as Vanderbilt, which are subject to the jurisdiction of the Mining Enforcement and Safety Administration pursuant to 30 U.S.C.A. § 722(a), are not even arguably regulated by OSHA.

The Occupational Safety and Health Act represents a carefully balanced legislative compromise concerning two primarily interested groups—employers and employees. *See generally* S.Rep. No. 1282, *supra.* Limitation of access to judicial review under the Act to employers, employees, and the Secretary of Labor helps to preserve this balance and appears to have been intended by Congress. *See* Conf.Rep. No. 1765, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 5228, 5235. Granting a right of action to Vanderbilt in this case would therefore contravene the policies of the Act and Congressional intent.

Vanderbilt asserts that if we deny it standing in this case it would never be able to challenge an OSHA regulation. But other avenues are available through which redress of its grievances may be sought. Although our holding that Vanderbilt lacks a right of action under the Occupational

9. Vanderbilt argues that the asbestos standard is unenforceable because of vagueness and procedural irregularities. We cannot, at this time, resolve these hypothetical issues which are immaterial to the disposition of this case. *See Preiser v. Newkirk, supra,* 422 U.S. at 401, 95 S.Ct. at 2334; *see also Communist Party of the United States v. Subversive Activities Control Bd.,* 367 U.S. 1, 71–72, 81 S.Ct. 1357, 1397–98, 6 L.Ed.2d 625 (1961).

10. The *Data Processing* Court used the "zone of interest" test to determine what parties are "adversely affected or aggrieved by agency action within the meaning of a relevant statute," and therefore entitled to a right of action by reference to Section 702 of the Administrative Procedure Act. The Occupational Safety and Health Act is a self-contained statute in that it does not depend upon reference to the APA for access to judicial review or for specification of the procedures to be followed. *Industrial Union Dept., AFL–CIO v. Hodgson,* 499 F.2d 467, 472 (D.C.Cir.1974). Nevertheless, because Section 660(a) of the Act, like Section 702 of the APA, provides a right of action to "[a]ny person adversely affected or aggrieved by [agency action]," the zone of interest test should be used to determine what parties are adversely affected or aggrieved and therefore entitled to a right of action.

Safety and Health Act precludes it from obtaining judicial review of the asbestos standard, Vanderbilt may still petition the Assistant Secretary of Labor to modify or revoke the standard. 29 C.F.R. § 1910.3(a). Moreover, we do not think that Vanderbilt is entitled to judicial review simply because it claims to have suffered economic injury. Wenczel, the employer found to be using asbestos; Wenczel's employees, who are exposed to asbestos; and the Secretary of Labor, who is charged with enforcing the asbestos standard, have chosen not to appeal the Commission's decision. As Professor Jaffe once observed, "If the interests which the law chooses to protect are satisfied with the status quo though it may involve an alleged violation, why should a stranger have a right to insist on enforcement?" [11]

APPEAL DISMISSED.

11. Jaffe, *Standing Again*, 84 Harv.L.Rev. 633, 637 (1971).